The next case on the calendar. Council will come forward, please. Mr. Nelson? Yes. Police court. My name is Douglas Nelson on behalf of the petitioners. Shall I begin? Sure. Your Honor, I've come prepared today to argue two of the most key issues in this case. Credibility and whether the persecution this petitioner suffered was on account of one of the five enumerated grounds. If we can establish those two things, I think the rest of the case has been proven that this man suffered atrocious past persecution in the form of being beaten, threatened, his wife suffering a miscarriage, family members disappeared, and the man who smuggled them out of the country who was eventually executed. Regarding credibility, the immigration judge denied in large part because the respondent expounded upon his pro se application for asylum. The judge characterized that as a radical departure from the initial pro se application. However, that pro se application was filled out by a non-professional, the applicant himself. And the petitioner did indicate and check the box of religion as one of the five enumerated grounds of persecution. Now, in this case, and pardon me, but you're damned if you do and you're damned if you don't in the eyes of the immigration judge. If you amend the application and provide the truthful history of the case, then you're adding information that wasn't in the initial application and that's not allowed. And if you fail to do that, then you're guilty of incompetence of counsel. So the so long and remember that this petitioner testified in a plausible, credible, and emotional manner. And in light of those facts, the fact that he added information to his application shouldn't be used to penalize him and find him not credible. Every year around March or April, we hear ads on the radio and TV that say, come to our accounting office and we'll check your last year's tax returns and we'll redo them and refund you money if it's owed to you. Are those persons who receive professional help, should they be penalized by an automatic audit or be considered to have filed the previously false 1040 form merely because they are exercising their right to see a professional and have their taxes done correctly? Likewise, in this case, this petitioner should not be penalized for that. The second reason the judge denied on credibility was because he said that there was no credibility. I mean, isn't it fair to distinguish between a petitioner who admits that they overstayed their visa or entered under a false passport or entered under a fraudulent visa of some kind, as opposed to, which is very frequent. I mean, the fact that that the petitioner makes an asylum claim is fairly common. In fact, it's rare to find a case where a person applies for asylum, at least at our level, where they were in status at the time. They're usually out of status when they make the application. But isn't it perfectly fair for an immigration judge to, when they ask, well, what about the visa that got you in this country, to expect that at that point that the petitioner would be honest and say, yes, I came in under false pretenses? Yes. And it is, of course, the applicant's duty to say so. In this case, the judge did not develop that ground of denial adequately in his decision. And the respondents testified truthfully to the fact that they paid someone in order to obtain their P visas, and those visas were obtained, and they used them and entered the United States, and they were effectively obtained in a fraudulent manner until thereafter. But that was not they paid for a visa, and they thought it was okay? In other countries, in Middle Eastern countries, it's very common to use a passport office or agency which knows, like a notary public or a legal consultant who prepares the application. If you go to the Tijuana consulate, there are many vendors outside of the country, or outside of the consulate, who prepare and type up the forms on old typewriters, not even computerized, and present the claim for you. They go right into the consulate and present the claim with you. So I don't think that's out of the ordinary. Your position is that what your client said was, I don't know whether this was a good visa or not, but here's what really happened. I paid for it. They gave it to me. That's what I entered on. And any flaws -- Is that right? Yes, Your Honor. And any problems with the manner of his entry, I think, shouldn't reflect poorly upon his eligibility for asylum, because his testimony was consistent, coherent, plausible, and emotional. It was a real, legitimate claim. Well, why doesn't it go to the essence of his claim, in this sense? He says, I'm an That's true. But in the beginning -- He wanted to enter the United States. And in the beginning, he does admit that he was paying the police for protection. We have to look at the entire context and circumstances of this petitioner. He was living in a society where that was common practice, and it didn't necessarily comport with his religious views. But in order to save himself his business and to eventually leave the country, he did pay government officials. Did he say in his written application form that religion played a very small part in his asylum claim? No, he did not say it played a small part. Rather, he checked the box in the application, which says, what are your five grounds? And he checked religion. And then below that, he wrote what he had suffered. And that was all done by himself. When he retained counsel, counsel executed a complete, detailed application of his claim. And in light of his- So the idea that it was a small part is the I.J.'s characterization. Yes. Because I'm looking at page 89 of the record. A small part of the initial application. Those weren't the petitioner's words. No, no, Your Honor. And I could show you in the record. I don't have the page memorized. But if you look at the application for asylum, I think it's the third or fourth page, which clearly demonstrates that he checked the box for religion and thereafter described the suffering. You can answer the question. Okay. Now, there's two other very important points that I think we need to get to. The first is that the judge denied on the lack of country conditions, which showed that Baptists in particular are persecuted. And I don't think that that can- I'm not going to go too much further into that. But basically, the respondent or the petitioner provided proof that persons are persecuted, discriminated and harassed on account of their religion. The fact that it doesn't specifically mention the Baptist religion, I think, is not relevant in light of the otherwise credible testimony. The big question in this case is whether this persecution was on account of one of the five grounds. Now, this court has recognized in many circumstances that circumstantial evidence of a mixed motive for persecution is allowable. And that's what we have in this case. The petitioner was paying the government for protection. When they learned of his religious convictions, i.e. he was compelled by his faith to support his church through money and donations, they said, leave your religion and give us that money. It wasn't just give us the money. It was betray your God, leave your religion. So Baptist, you betrayed us by failing to comply with their demands. It was a significant component. And let's look at the overall circumstances. This is a government, a country that was hostile to religion for 70 or 80 years. And that hostility is pervasive throughout the society. He was forced to go to an education camp, a re-education camp as a child. So when criminal elements or corrupt officials want to exploit a person for money, it's logical to assume that they're going to exploit religion as they did in this circumstance. You're down to about a minute and a half. Did you want to save any time for rebuttal? Yes, I do. Thank you, Your Honor. Thank you for your argument, counsel. We'll now hear from the government. Counsel? Yes. May it please the court. Your Honor, you're Mr. Kovillion? Yes, Your Honor. Did I pronounce that right? That's Kovillion. Kovillion. Yes. Your Honors, I think that if I brief this case again, that I would have to offer the court a restatement of the issue as follows, because we did brief it in terms of substantial evidence. But I think you can parenthetically rephrase that in this way. Does an extortion scheme perpetrated by rogue, corrupt policemen misusing their office in league with criminals, does that extortion, which is, of course, for money, become transformed or changed or significantly tainted, however you wish, whatever verb one wants to apply to that, when in the course of the extortion, the extortioners discover that their victim asserts certain scruples to the ongoing scheme that are based upon his religious principles and the problems ensue? Now, does that insertion along the way make a difference? And the petitioner says it does, of course, and that this is a mixed motive type case. I don't recall that we really briefed that theory of it. I think the theory thus far was that the victim was, in fact, it was said, persecuted or extorted because of his religion. And, of course, the record doesn't support that. It's this- Let me interrupt, if I might. How does the theory you're expressing now, how does that theory differ from the theory that we rejected in the Philippines cases with the- The Borja case. Yes, because in a sense, that's a pure extortion, arguably. The government said this is pure extortion. And we said, well, that's a mixed motive. And extortion may have been part of it, but there was a view expressed that fell within the protected ground. Therefore, it was mixed motive, and therefore, it needed reanalysis on a mixed motive basis. How does- You seem to be saying you can't just insert religion into an extortion scheme and lift this claim up into a protected ground type of case. Yes. Why doesn't the NPA analogy apply? If I may, first, I wasn't saying that it never could. I said it strikes me that that's what we're really talking about. And that's how I would have parenthetically- Well, if we are really talking about that, then why isn't it a mixed motive? In Borja and the other- I see. Briones. I'm sorry? Briones. Is the other case. Oh, I was- OK, I thought- Borja and Briones. Yes, about the same time. You're talking about insurgents, rebels who are victimizing someone. You've got politics always lurking in the background. And, for example, in Borja, the extortion was ongoing, and it was only after the victim, well along the way, expressed her opinion about the politics of the insurgents. And they acted in regard to that in a way that had nothing to do with extortion. We have nothing in here- this case, by contrast, has nothing to do with insurgencies, civil conflicts, civil wars. It is a country that has sort of an interesting, for lack of a better description, attitude about this. I remember reading a couple of years ago that President Putin quoted as saying something to the effect of, never confuse bribery with corruption. And the elected leader of your country is saying that. And, you know, this is a country, seriously, where business executives, including American business executives, get executed, kidnapped for ransom. Well, I mean, it's-  It's no secret that in many, if not most, parts of the world that payments, kickbacks, et cetera, et cetera, are part of doing business. I mean, I've seen repeatedly in the papers, for example- But I've never heard a governor or the president of the United States say- tell people to never confuse bribery with corruption. No, you probably wouldn't unless you were listening to a former governor of Louisiana, but- who's now in prison. But we're one of the few- There's a difference in the element of control. I mean, the legal standard, seriously, is, is it a group that the government cannot or will not control? And aren't these criminal elements in modern Russia, don't they fall into that category? They probably do. In fact, on page 23 of our brief, we cite to the court three, four, five examples in the country report, which confirm that local criminal elements in league with rogue policemen and agents make life difficult for people with money, businessmen. But it doesn't mean that the government is sponsoring it or not- Or unable to control it. I mean, that's the issue, isn't it? I mean, again, returning to the New People's Army analogy, I guess I'm having some difficulty seeing the difference, and perhaps you can help me out with that. But in the New People's Army, you have a lawless element that demands money, and then when a political opinion is expressed, there's punishment. Now, you distinguished it, I think you were trying to say, well, there's no political element, but the claim is not that here, it is a religious element. So you have a lawless element, demands extortion, a religious viewpoint is expressed, and they attempt to punish their religious viewpoint. Tell me what the difference is. How do you see the difference in this case? What we see here, what the fact finders saw, was attempts by the extortionists to overcome the scruples, which came along the way and not at the beginning, and there are two facets here. One was protection money, which was not a problem until it got to be too much. The second was the kickback thing. That's where the scruples really kicked in, because that he saw, he says, as against principles. But how would it differ? I usually call him Borja. Didn't she make some payments for a while and then stop? The payments started like at the beginning of the year, and that's all it was, and then maybe towards the end of the year is when this political thing pops up and she's cut on the arm or she pops off and they react. So what's different from this where he cooperates for a while and then religion pops up? Well, first let me say, it won't help me much, but I still can't find the connection in Borja that the Borja rehearing panel found. You disagree with our decision. But be that as it may. You're allowed a beef or two. Well, I mean. But that's the precedent that controls our analysis. Well, here, that's why I was trying to rephrase it. Does this element taint or transform or refigure the whole thing that's going on? What's happening is the extortionists now are using this to get at this guy because it means the money that they want is being divided with his church and it means that he's reluctant to go into the second phase of this thing because of religious scruples. The fact finder didn't see it that way, and it was just something they had to overcome. Now, why does it become religious persecution? Because it pops up in the middle. Well, that's when you made that argument. Borja popped up in my mind. Yes, of course. It popped up in everyone's mind. It's like a familiar argument to me. Yeah. They did something different in Borja when it came up. Did they do anything different here as extortionists they wouldn't do? No. We understand your argument. Thank you very much, counsel. You have a little over a minute for rebuttal. Thank you, Your Honor. Mr. Nelson, pick up on what Mr. Kuvion just said. How did the treatment of your client differ when religion popped up? And I have an analogy that I was just thinking about. How about a reference to the record? Okay. The corrupt government officials were satisfied with the amount of money that he was giving until they learned of his devotion of his faith, which required him to provide money to his Baptist faith. And they said, the obstacle in order to get that money is your faith. Get rid of your faith. And that was their solution. Not just merely give us money, but get rid of your faith was a component of their persecution. Are you saying that there's evidence that they said, now that we've found out that you're giving money to the church, give it to us instead of the church? Oh, yes. Yes. And that is in the record. Did you raise the mixed motive question before the BIA? Yes. Gonzalez Naira was decided before this case was heard. That's my recollection. And it was clearly raised before the board. I know that because I wrote the brief. And so, yes, the Gonzalez Naira case is clearly the case of mixed motive, which I was relying upon. Now, and this case is akin to corrupt government officials who have been receiving grafts from, let's say, a Mormon merchant and then turning to the merchant and saying, we want you to sell alcohol and cigarettes in violation of the most basic tenets of your religion. And your failure to do so will result in you being beaten and harmed. I mean, this gentleman was asked to violate the most basic tenets of his religion, two of the commandments at least, bearing false witness and stealing. And so I think that when they learned of that component, that is when the persecution was clearly ramped up and they always made religion a component of his persecution thereafter. Thank you. Thank you. Thank both counsel for the arguments. The case just argued will be submitted for decision. We'll proceed to the next case on the calendar, which is Manoson. Counselor President, they've come forward.
judges: Hawkins, Thomas, Bea